# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 23, 2008         Decided February 22, 2008

No. 07-1088

HOLRAIL, LLC,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

CSX TRANSPORTATION, INC.,
INTERVENOR

———

On Petition for Review of an Order of the
Surface Transportation Board

———

*Jeffrey O. Moreno* argued the cause and filed the briefs for petitioner.

*Jeffrey D. Komarow*, Attorney, Surface Transportation Board, argued the cause for respondent. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Evelyn G. Kitay*, Associate General

Counsel.  *Craig M. Keats*, Deputy General Counsel, entered an appearance.

*Louis E. Gitomer* was on the brief for intervenor.  *Paul R. Hitchcock* entered an appearance.

Before:   TATEL, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  Under 49 U.S.C. § 10901(d), an existing railroad may not, except in certain limited circumstances,  block construction of a new rail line by "refusing to permit the [new] carrier to cross its property."  In this case, the Surface Transportation Board held that the word "cross" does not include one carrier's construction of a new line on another's right-of-way.  We agree.

## I.

In 1894, Andrew Carnegie, unhappy with the rates the Pennsylvania Railroad was charging to ship coke to his steel mills in Pittsburgh, joined New York Central Railroad's attempt—led by its chief stockholder, William Henry Vanderbilt—to build a competing railroad, the South Pennsylvania. *See* DAVID NASAW, ANDREW CARNEGIE 252-55 (2006).  Over a century later and following in Carnegie's footsteps, petitioner HolRail LLC, unhappy with the service provided and rates charged by CSX Transportation, Inc. (CSXT), proposes to build its own railroad to ship materials to and from its cement and masonry products plant in Holly Hill, South Carolina.  CSXT provides exclusive rail service for the Holly Hill facility for both outgoing products and incoming raw materials.  Its tracks run south for two miles

from the Holly Hill facility along a narrow right-of-way, bordered by wetlands to the east and a highway to the west, to a line operated by the Norfolk Southern. HolRail proposes to build its own line connecting the Holly Hill facility to the Norfolk Southern line.

In a petition to the Surface Transportation Board, HolRail proposed two possible routes for its 2.3-mile railroad. But unlike Carnegie and Vanderbilt, who started building their new railroad on their own property—which, after the project's abandonment, became the roadbed for part of the Pennsylvania Turnpike—HolRail's preferred route ran for 1.7 miles along CSXT's right-of-way. Its alternate route ran parallel to CSXT's tracks but on HolRail's own property.

Ordinarily, carriers wishing to construct a railroad ask the Board to issue a certificate of "public convenience and necessity" pursuant to 49 U.S.C. § 10901(c). HolRail instead sought an exemption from the certificate requirement by filing a petition under 49 U.S.C. § 10502(a), which allows the Board to exempt carriers from certain rail transportation requirements. All parties agree, however, that HolRail's decision to file a section 10502(a) exemption petition rather than a section 10901(a) petition for a certificate of public convenience and necessity makes no difference: if the Board grants a section 10502(a) exemption request, it summarily issues a certificate of public convenience and necessity. *See Midwest Generation, LLC*, 6 S.T.B. 398, 401-02 (Oct. 3, 2002).

In its exemption petition, HolRail said that to construct the preferred route, it would file a petition pursuant to 49 U.S.C. § 10901(d) to "cross" CSXT's right-of-way. Section 10901(d) provides:

(1) When a certificate has been issued by the Board under this section authorizing the construction or extension of a railroad line, no other rail carrier may block any construction or extension authorized by such certificate by refusing to permit the carrier to *cross its property* if—

(A) the construction does not unreasonably interfere with the operation of the crossed line;

(B) the operation does not materially interfere with the operation of the crossed line; and

(C) the owner of the crossing line compensates the owner of the crossed line.

49 U.S.C. § 10901(d)(1) (emphasis added). If a carrier refuses to consent to a crossing, the owner of the crossing line may petition the Board for authority to cross. *Id.* § 10901(d)(2) ("If the parties are unable to agree on the terms of operation or the amount of payment for purposes of paragraph (1) of this subsection, either party may submit the matters in dispute to the Board for determination."). Denying consent to the crossing, CSXT moved to dismiss HolRail's exemption petition.

The Board, observing that "HolRail's entire case—indeed, even the details of how its construction proposal will look—is inextricably bound up with the crossing issue," deferred judgment on HolRail's exemption request until HolRail filed its crossing petition. STB Finance Docket No. 34421 (Sub-No. 1) at 3 (Oct. 20, 2004). "As a practical matter," one Board member wrote, "it appears that the only way HolRail could build its preferred route is by 'taking'

CSXT's right-of-way for essentially the entire line it wants to construct." *Id.* at 5.

Following discovery, HolRail filed a formal crossing petition for its preferred route. CSXT opposed the petition but took no position on the alternate route. The Board then denied HolRail's crossing petition, concluding that "HolRail's request does not come within the intended scope and purpose of [49 U.S.C. § 10901(d)]." STB Finance Docket No. 34421 (Sub-No. 1) at 1 (Feb. 9, 2007) ("Crossing Decision"). The Board explained:

> We do not believe that Congress envisioned or meant to mandate arrangements of the sort presented here, where the proponent of a new line seeks to use section 10901(d) as a substitute for obtaining its own right-of-way for a significant amount of the property that it would need. . . . There is no indication that by enacting the crossing statute Congress meant to provide a means by which a new carrier could avail itself of a significant portion of an incumbent carrier's right-of-way in lieu of obtaining its own right-of-way, regardless of the difficulties it would otherwise face. Had Congress meant to provide for a new competitor to access the private property of an incumbent rail carrier to that degree, it presumably would have discussed such a significant change.

*Id.* at 5.

Having denied the crossing petition, the Board dismissed as moot HolRail's exemption petition, "which depend[ed]

upon that crossing authority." *Id.* at 7. HolRail's alternate route remains pending before the Board. HolRail now petitions for review. *See* 28 U.S.C. § 2342(5) (authorizing review by the Court of Appeals of "all rules, regulations, or final orders of the Surface Transportation Board").

**II.**

We review the Board's interpretation of section 10901(d) under the familiar principles of *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). We first "employ[] traditional tools of statutory construction" to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 843 n.9. "If the intent of Congress is clear, that is the end of the matter." *Id.* at 842. "[I]f the statute is silent or ambiguous with respect to the specific issue," however, we proceed to step two and defer to any "permissible construction of the statute" offered by the agency. *Id.* at 843; *see also W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1171 (D.C. Cir. 2000) (deferring to the Board's reasonable interpretation).

HolRail argues that the Board's interpretation of section 10901(d) contravenes Congress's unambiguously expressed intent. According to HolRail, "the *only* grounds for denying a crossing of property by a Board-authorized rail construction are those listed in sub[sections] (A)-(C)." Pet'r's Opening Br. 29. Under those subsections, railroads must permit other carriers to cross their property if the new line will not "interfere with the operation of the crossed line" and if "the owner of the crossing line compensates the owner of the crossed line." 49 U.S.C. § 10901(d)(1)(A)-(C). If these conditions are met, HolRail argues, the Board must grant the crossing petition.

HolRail ignores section 10901(d)'s operative phrase, "cross its property." Before the Board considers whether subsections (A) through (C) apply, it must first determine whether HolRail's preferred route even amounts to a crossing. Absent a crossing, the Board would have no need to consider subsections (A) through (C), and nothing in section 10901(d) or any other provision of the statute would prohibit CSXT from denying HolRail access to its right-of-way.

Therefore, as HolRail concedes in its reply brief, the "precise question at issue," *Chevron*, 467 U.S. at 842, is "whether HolRail's [p]referred [r]oute falls within the meaning of 'to cross [another railroad's] property' in 49 U.S.C. § 10901(d)(1)." Pet'r's Reply Br. 3-4 (third alteration in original). According to HolRail, the answer to this question is unambiguously yes. Invoking dictionary definitions, HolRail argues that "any and all Board-authorized construction of a rail line that involves an incursion onto, across or over the property of another railroad" qualifies as a crossing, and that its preferred route satisfies these definitions because it "crosses" onto CSXT's property. *Id.* at 7. For its part, the Board concluded that the statute unambiguously supports its position, i.e., that HolRail's preferred route does not qualify as a "crossing." "As the plain language of the statute makes clear," the Board explained, "Congress's purpose was to remove an incumbent carrier's ability to obstruct or prevent the construction and operation of a new rail line by unreasonably refusing to provide the sort of reasonable accommodations that have long been common in the railroad industry and which enable the constructing carrier to intrude slightly upon the incumbent's property to connect segments of the proposed new line that would otherwise be separated." Crossing Decision at 5.

We agree with the Board. Although the term "cross" may have multiple meanings in some circumstances, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). "In determining whether a statutory provision speaks directly to the question before us, we consider it in context." *Holly Sugar Corp. v. Johanns*, 437 F.3d 1210, 1213 (D.C. Cir. 2006). Thus, "[t]he issue is not so much whether the word '[cross]' is, in some abstract sense, ambiguous, but rather whether, read in context . . . , the term '[cross]' encompasses" HolRail's preferred route. *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004). Viewed in the "context" of this case, the word "cross" is hardly ambiguous. HolRail's preferred route never crosses CSXT's right-of-way in any ordinary sense of that word. Instead, it enters CSXT's right-of-way, runs along it for 1.7 miles—or two-thirds of the route's length—then exits the right-of-way on the same side from which it entered. If this amounts to a "crossing," then nothing would prevent HolRail from using section 10901(d) to force Norfolk Southern—or for that matter, any other carrier that ships its products—to permit the construction of a competing line on its right-of-way as well. Nothing in section 10901(d)'s text or legislative history even hints that Congress intended the provision to be used in such a way. As the Board pointed out, "[h]ad Congress meant to provide for a new competitor to access the private property of an incumbent rail carrier to that degree, it presumably would have discussed such a significant change." Crossing Decision at 5. Because the statute, read in context, clearly resolves the case in the Board's favor, we have no need to proceed to *Chevron* step two.

Before the Board, HolRail relied on *Burlington Northern & Santa Fe Railway Co.*, 6 S.T.B. 862 (May 9, 2003), in which the Board allowed one carrier, whose tracks had

always crossed the right-of-way of another carrier, to use the latter's right-of-way for a quarter of a mile in order to accommodate a track realignment that had disrupted the existing crossing. As the Board explained, that situation differed significantly from HolRail's preferred route. In that case, the crossing carrier "was not seeking to use [the crossed carrier]'s property to attract new customers or reach new markets, but only to continue to access its own shippers on its own line after a track realignment that necessitated a change in what had been a longstanding crossing." Crossing Decision at 6.

### III.

Finally, HolRail argues that the Board should have resolved its section 10502(a) exemption petition before addressing the crossing issue. In support, it points out that section 10901(d) begins "[w]hen a certificate has been issued by the Board . . . ." From this, HolRail contends that the Board may consider a crossing petition only after it has issued a certificate of public convenience and necessity pursuant to section 10901(c). We disagree. Although section 10901(d) certainly requires the Board to consider a crossing petition once it has issued a certificate of public convenience and necessity, nothing in that provision or anything else in the statute bars the Board from proceeding first with the crossing issue where, as here—and as HolRail's counsel conceded at oral argument—HolRail has no way of proceeding with its preferred route without obtaining crossing authority. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) (stating that absent statutory requirements, "the formulation of procedures [i]s basically to be left within the discretion of the agencies to which Congress ha[s] confided the responsibility for substantive judgments"). Indeed, it would make no sense at all to require the Board to issue a

certificate of public convenience and necessity for a rail line that could never be built.  We deny the petition for review.

*So ordered.*